UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ST. JOHNS RIVERKEEPER, INC.,

     Plaintiff,

     v.

U.S. METAL TRADING INC.,

     Defendant.

Civil Case No.: 23-1244

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL
PENALTIES**

     Plaintiff ST. JOHNS RIVERKEEPER, INC., by and through its counsel,
hereby alleges:

**I.    JURISDICTION AND VENUE**

     1.    This is a civil suit brought under the citizen suit enforcement
provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.*
(the "Clean Water Act" or "the Act"). This Court has subject matter jurisdiction
over the parties and the subject matter of this action pursuant to Section
505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action
arising under the laws of the United States). The relief requested is authorized
pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of
actual controversy and further necessary relief based on such a declaration); 33
U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a)
(civil penalties).

     2.    On July 26, 2023, Plaintiff provided notice of Defendant's violations
of the Act, and of Plaintiff's intention to file suit against Defendant ("notice

letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region 4; the Secretary of the Florida Department of Environmental Protection ("DEP"); the Director of the Northeast District of the DEP; and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of Florida has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Middle District of Florida pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   <u>INTRODUCTION</u>

5.      Defendant discharges polluted storm water from a metal recycling yard in Jacksonville. These discharges are in violation of the Clean Water Act and the State of Florida's Multi-Sector Generic Permit for Stormwater Discharge Associated with Industrial Activity.

6.      Florida's Multi-Sector Generic Permit is a National Pollution Discharge Elimination System ("NPDES") permit required under the Act that is issued by the DEP under the authority of Florida Statute Section 403.0885, which authorizes Florida to implement the NPDES program pursuant to authority delegated to the State of Florida by the EPA. Pursuant to Florida Administrative Code ("F.A.C.") Rule 62-621.300(5)(a), Florida adopted the EPA's original Multi-

Sector General Permit issued on September 29, 1995 (60 Fed. Reg. 50804) and subsequent corrections and modifications as amended on February 9, 1996 (61 Fed. Reg. 5248), February 20, 1996 (61 Fed. Reg. 6412), August 7, 1998 (63 Fed. Reg. 42534), September 30, 1998 (63 Fed. Reg. 52430), and January 19, 1999 (64 Fed. Reg. 2898) (hereinafter collectively referred to as the "MSGP"). Defendant's violations of the substantive and procedural requirements of the MSGP and the Act are ongoing and continuous.

7. With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. Storm water picks up industrial pollutants and typically discharges them directly into nearby waterbodies or indirectly via storm sewer systems. Discharge of storm water from areas where industrial activities occur can contain toxic pollutants when facility practices allow exposure of industrial materials to storm water. This increased flow and pollutant load can impair waterbodies, degrade biological habitats, pollute drinking water sources, and cause flooding and hydrologic changes to the receiving water, such as channel erosion. In most of the Jacksonville area, storm water flows untreated either directly, or through municipal storm drain systems into the St. Johns River and its tributaries. Stormwater pollution accounts for a significant amount of the pollution entering the St. Johns River watershed each year. Storm water pollution poses a health risk to humans, harms marine life, closes beaches, contaminates the ocean, and harms the environment. These contaminated storm water discharges can and must be controlled for the St. Johns River watershed to regain its health.

8. The St. Johns River possesses special aesthetic, economic, and recreational significance for people living in the surrounding communities. Portions of the St. Johns River and its tributaries, which receive toxic metals and

other contaminants in storm water discharges from Defendant's industrial activities, are listed on the State of Florida's Clean Water Act Section 303(d) list of impaired water bodies. A water body that is listed as impaired cannot support its designated beneficial uses.

9.     The St. Johns River watershed provides essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that the St. Johns River watershed has for people in the surrounding communities. The public's use of the St. Johns River and its tributaries for recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation exposes many people to toxic metals and other contaminants in storm water discharges and impairs those activities.

## III.  PARTIES

10.     Plaintiff St. Johns Riverkeeper is a Jacksonville-based non-profit public benefit corporation with members throughout Northeast and Central Florida, including Duval County, St. Johns County, Nassau County, Putnam County, Flagler County, Baker County, Clay County, Volusia County, Marion County, Lake County, Seminole County, Orange County, Alachua County, Osceola County, Brevard County, and Indian River County. St. Johns Riverkeeper's mission is to defend the St. Johns River and advocate for its protection. To further its mission, St. Johns Riverkeeper actively seeks federal and state implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members. St. Johns Riverkeeper has been registered as a non-profit corporation in Florida since 1999 and has maintained its good and current standing in Florida since that time. St. Johns Riverkeeper is a licensed member of Waterkeeper Alliance, Inc., an

international non-profit environmental organization, made up of over 360 separate Waterkeeper programs, such as St. Johns Riverkeeper.

11.     Members of St. Johns Riverkeeper use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of St. Johns Riverkeeper use those waters for fishing, boating, body contact water sports and other forms of recreation, wildlife observation, aesthetic enjoyment, educational study, and spiritual contemplation. Defendant's discharges of pollutants threaten or impair each of those uses. Thus, the interests of St. Johns Riverkeeper's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Act and the MSGP. The relief sought herein will redress the harms to St. Johns Riverkeeper caused by Defendant's activities.

12.     Plaintiff brings this action on behalf of its members, respectively. Plaintiff's interest in reducing Defendant's discharges of pollutants into the St. Johns River and its tributaries and requiring Defendant to comply with the requirements of the MSGP are germane to Plaintiff's organizational purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of Plaintiff's individual members.

13.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

14.     Defendant U.S. METAL TRADING INC. ("U.S. Metal Trading") is a corporation that owns and/or operates the industrial facility located at 614 McDuff Avenue North, Jacksonville, FL 32254 ("Facility").

**IV.    STATUTORY BACKGROUND**

**Clean Water Act**

15.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge

of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

16.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). It authorizes the EPA to issue NPDES permits directly and also to delegate the authority to issue NPDES permits to state agencies.

17.     States with EPA-approved NPDES permit programs are authorized to regulate industrial storm water discharges through individual permits issued to dischargers or through general permits that cover a category of dischargers. 33 U.S.C. § 1342(p).

18.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized the DEP to issue NPDES permits including general NPDES permits in Florida.

19.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $64,618 per day per violation pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

**<u>Florida's MSGP</u>**

20.     The DEP elected to issue the MSGP as the statewide general permit for industrial storm water discharges. Thus, Florida has a single, statewide general permit applicable to all industrial storm water dischargers.

21.     In order to discharge storm water lawfully in Florida, industrial dischargers must obtain coverage under and comply with the terms of the MSGP or obtain and comply with an individual NPDES permit. 33 U.S.C. § 1311(a).

22.     The MSGP contains a variety of substantive and procedural requirements that all dischargers must meet.

23.     Part XI.N of the MSGP pertains to Sector N facilities. These are facilities that possess a Standard Industrial Classification ("SIC") Code of 5093. Sector N facilities discharge storm water associated with industrial activity from scrap recycling and waste recycling facilities. In addition to the general requirements that the MSGP imposes on all dischargers, Part XI.N of the MSGP imposes certain additional specific terms and conditions on Sector N Facilities.

24.     The MSGP is built on the expectation that its requirements will predominantly be met through a permittee's use of best management practices ("BMPs"). BMPs can take a wide variety of forms, from frequent sweeping to making structural modifications such as roofing or installing storm water filtration and treatment, as necessary.

25.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). In turn, the Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants (i.e. most pollutants), permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ." 33 U.S.C. § 1311(b)(2)(A). The Act also sets a different standard, "application of the best conventional pollutant control

technology" for a defined set of five "conventional pollutants." *Id.* at §
1311(b)(2)(E).[1]

26.     Accordingly, the MSGP requires permittees to use BMPs that reflect,
and prohibits the discharge of pollutants above the level commensurate with,
application of the best available technology economically achievable ("BAT"), for
toxic and non-conventional pollutants and best conventional pollutant control
technology ("BCT") for conventional pollutants. *See* 60 Fed. Reg. at 50812; *see also*
MSGP § XI.N.3.a.3, 60 Fed Reg. at 51190.

27.     The MSGP also requires dischargers to develop and implement a
storm water pollution prevention plan ("SWPPP"). MSGP § IV. Among other
things, the SWPPP records the BMPs applied at a particular industrial facility.
Sector N facilities must develop and implement a SWPPP that comports with
several requirements of Part XI.N of the MSGP. Through the SWPPP,
requirements in Part XI.N of the MSGP implement its BAT/BCT requirements
for Sector N facilities by requiring that the pollution prevention plan minimize
pollution and requiring specific BMPs to effectuate such minimization. *See* MSGP
Fact Sheet § VI.B, 60 Fed. Reg. at 50812 ("The pollution prevention or BMP
requirements in this permit operate as limitations on effluent discharges that
reflect the application of BAT/BCT.")

28.     The MSGP provides that: "[T]he plan shall describe and ensure the
implementation of practices that are to be used to reduce the pollutants in storm
water discharges associated with industrial activity at the facility and to assure
compliance with the terms and conditions of this permit. Facilities must
implement the provisions of the storm water pollution prevention plan required

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation,
40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal
coliform, and oil and grease.

under this part as a condition of this permit." MSGP § IV, 60 Fed. Reg. at 51115.

29.     Facilities subject to Sector N must include, *inter alia*, the following in their SWPPPs: (1) identification of all the members of a storm water pollution prevention team responsible for developing and implementing the SWPPP; (2) a description of potential pollutant sources; (3) a site map including, *inter alia*, outfall locations, types of discharges in the drainage areas, location where significant materials are exposed to precipitation, monitoring locations, and flow directions; (4) an inventory of the types of materials at the site that may be exposed to precipitation; (5) a list of significant spills and leaks of toxic or hazardous pollutants that occurred at areas that are exposed to precipitation; (6) a summary of existing discharge sampling data; (7) a narrative description of potential pollutant sources from various activities; (8) a description and implementation of appropriate storm water management controls (including various specific requirements); (9) spill prevention and response measures; (10) a quarterly inspection program; and (11) an employee training program. MSGP §§ XI.N.3.a(1), XI.N.3.a(2)(a)-XI.N.3.a(2)(e), XI.N.3.a(3)(a)(i)-XI.N.3.a(3)(a)(xii) (requirements for scrap and waste recycling facilities (nonsource-separated, nonliquid recyclable wastes)).

30.     Part XI.N.3.a(3)(a) of the MSGP requires that Sector N facilities develop and implement appropriate storm water management controls including the following:

- Measures and controls to "minimize contact of storm water runoff with stockpiled materials, process materials, and nonrecyclable wastes," as well as "measures to minimize the extent of storm water contamination from those areas." The facility operator must consider using the following BMPs or their equivalents: diversion of runoff, media filtration, silt fencing, and oil/water separators, sumps, and dry adsorbents. Part XI.N.3.a(3)(a)(ii).

- "[M]easures necessary to minimize contact of surface runoff with residual cutting fluids." This includes a requirement to consider implementing one of two (or a combination) types of measures – either storage of turnings under cover or a dedicated containment area for turnings. Part XI.N.3.a(3)(a)(iii).

- "[M]easures and controls to minimize residual liquids and accumulated particulate matter, originating from scrap and recyclable waste materials stored indoors or under cover, from coming in contact with surface runoff." This part requires that dischargers consider including various housekeeping measures. Part XI.N.3.a(3)(a)(iv).

- Address "areas where scrap and waste processing equipment are sited" by adopting "measures and controls to minimize surface runoff from coming in contact with scrap processing equipment." Part XI.N.3.a(3)(a)(v).

- Provide appropriate source control, stabilization measures, nonstructural, structural controls or equivalent for areas at the facilities that are associated with industrial activity that have a high potential for soil erosion and suspended solids loadings. This requires consideration of a variety of erosion and sediment control BMPs. Part XI.N.3.a(3)(a)(vii).

- Provide for a detention or retention basin or equivalent when BMPs installed pursuant to Part XI.N.3.a(3)(a)(vii) do not prove sufficient. Part XI.N.3.a(3)(a)(viii).

60 Fed. Reg. at 51190–93 (detailing specific requirements for facilities processing non-liquid recyclable waste).

31. In addition to requiring that permittees select and install BMPs and develop a SWPPP to meet the Clean Water Act's standards, the MSGP also requires facility operators to implement monitoring and reporting requirements that allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP. Sector N permittees must monitor their storm water discharges at least quarterly during the second and fourth year of the permit term. They must provide "the date and duration (in

hours) of the storm event(s) sampled; rainfall measurements or estimates (in inches) of the storm event that generated the sampled runoff; the duration between the storm event sampled and the end of the previous measurable (greater than 0.1 inch (") rainfall) storm event; and an estimate of the total volume (in gallons) of the discharge sampled." MSGP §§ XI.N.5.a. They must collect samples during sampling periods of January to March, April to June, July to September, and October to December. *Id.* Samples must be "collected from the discharge resulting from a storm event that is greater than 0.1" in magnitude and that occurs at least 72 hours from the previously measurable (greater than 0.1" rainfall) storm event." *Id.*

32.     In addition to analytical monitoring, dischargers must also make quarterly visual examinations of representative storm water discharges. *Id.* at § XI.N.5(c). Dischargers must document their observations of color, odor, clarity, floating solids, settled solids, suspended solids, foam, oil sheen, and other obvious indicators of storm water pollution at each discharge location. *Id.* at § XI.N.5(c)(1). These observations are to be recorded and kept onsite with the SWPPP. *Id.* at § XI.N.5(c)(2). Based on the results of the analytic and observational monitoring, dischargers are required to evaluate the need for additional BMPs and modifications to the facility's SWPPP.

33.     The MSGP requires that Sector N facilities conduct, at a minimum once per year, comprehensive site compliance evaluations, include those evaluations in the SWPPP, and revise storm water pollution prevention measures and controls accordingly based on the results of those evaluations. MSGP § XI.N.3(a)(4).

34.     For Sector N facilities, the MSGP establishes the following cut-off concentrations for pollutants of concern: chemical oxygen demand ("COD") – 120 mg/L, total suspended solids ("TSS") – 100 mg/L, total recoverable

aluminum – 0.75 mg/L, total recoverable copper – 0.0636 mg/L, total recoverable iron – 1.0 mg/L, total recoverable lead – 0.0816 mg/L, total recoverable zinc – 0.117 mg/L. MSGP § XI.N.5.a; 61 Fed. Reg. 5248 (February 9, 1996) (amending cut-off concentration for zinc).

35.     The cut-off concentrations are used "to assess the effectiveness of the pollution prevention plan and to help ensure that a reduction of pollutants is realized." 60 Fed. Reg. at 50843 (Monitoring and Reporting Requirements). They "provide a reasonable target for controlling storm water contamination by pollution prevention plans." *Id.* at 51076.

36.     The cut-off concentrations are guidelines for determining whether a facility has implemented the requisite BAT/BCT level of control measures. Further, exceedances of cut-off concentrations are reason for concern that pollution may have reached a level "at which a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

37.     The MSGP does not provide for any mixing zones by dischargers. The MSGP does not provide for any receiving water dilution credits to be applied by dischargers.

### Beneficial Uses of Florida Surface Waters

38.     The State of Florida has identified beneficial uses and designated all surface waters of the State of Florida as Class III – Recreation, Propagation and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife, except for certain waters which are described in subsection 62-302.400(16), F.A.C.  Rule 62-302.400(15), F.A.C. "Class I, II, and III surface waters share water quality criteria established to protect fish consumption, recreation and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife." Rule 62-302.400(4), F.A.C.

**Impairments of Receiving Waters**

39.     The segment of the St. Johns River above Trout River is impaired by iron.

**V.     STATEMENT OF FACTS**

**Metal Recycling and Fabrication Facilities**

40.     Metal recycling facilities, especially those with outdoor stockpiling, processing and segregation of materials, have been identified as a major source of storm water contamination. Scrap metal in different stages of corrosion and decay may release a variety of harmful substances including but not limited to heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical residues. 60 Fed. Reg. 50804, 50953–63 (listing common pollutants associated with Sector N—scrap and waste recycling facilities—as of 1995).

41.     In addition to the storage and processing of various sources of metal, metal recycling facilities also conduct vehicle operation and maintenance and equipment operation and storage. Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to areas on and off the premises. Vehicles also expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

**Stormwater Pollution at the Facility**

42.     Defendant owns and/or operates the Facility, a metal recycling facility located in Jacksonville, FL.

43.     Based on Plaintiff's investigation, including a review of the Facility's Notice of Intent to Use Multi-Sector Generic Permit for Stormwater Discharge Associated With Industrial Activity ("NOI"), aerial photography, and Plaintiff's information and belief, storm water is collected and discharged from the Facility via at least two outfalls.

44.     Storm water discharged from the Facility flows into storm drains that flow into McCoys Creek, which flows into the St. Johns River (collectively, "Receiving Waters").

45.     The Receiving Waters are waters of the United States.

46.     The Facility's current coverage under the MSGP is active from August 29, 2022, through August 28, 2027. This is a continuation from the Facility's previous coverage under the MSGP.

47.     U.S. Metal Trading has certified that the Facility is classified under SIC Code 5093, meaning that it is primarily engaged in assembling, breaking up, sorting, and wholesale distribution of scrap and waste materials. On information and belief, Plaintiff alleges that the Facility receives a variety of waste materials, primarily ferrous and non-ferrous metals, and store, process, crush, and compact these materials. The majority of activity and storage at the Facility takes place outdoors, where pollutants are exposed to storm water.

48.     Part XI.N of the MSGP is divided into three separate classes of recycling facilities. The Facility falls under the initial category: "scrap recycling and waste recycling facilities (non-liquid recyclable waste)."

49.     On information and belief, Plaintiff alleges that the Facility releases the following pollutants into the immediate environment: toxic metals such as aluminum, copper, iron, lead, zinc; as well as petroleum products including oil, gasoline, grease, and diesel fuel, battery fluids, acids and solvents, and total organic carbon, suspended solids, and pH-altering substances.

50.     On information and belief, Plaintiff alleges that other significant potential pollutant sources at the Facility include heavy metals, fuel, oil, lubricants, polychlorinated biphenyls, grease, lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint and paint thinner, chemical residues, kerosene, machine cutting fluid, waste sand, and machine shop filings.

51.     The large number of trucks and other vehicles entering and leaving the Facility from the driveways track pollutants off-site onto public streets where rainfall washes these pollutants into storm drains that discharge into waters of the United States.

52.     On information and belief, Plaintiff alleges that storm water flows over the surface of the Facility where industrial activities occur including, but not limited to, receiving materials and product transport, processing of metals, maintenance of forklifts and equipment, and areas where airborne materials associated with the industrial processes at the Facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges, that storm water flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the Facility's storm water discharge locations.

53.     On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contains storm water that is commingled with runoff from areas at facility where industrial processes occur.

**Permit Violations at the Facility**

54.     As noted above, MSGP permittees must limit pollution in industrial storm water to a level commensurate with the federal BAT and BCT standards; develop and implement SWPPPs that set forth the best management practices that the permittee is using to meet those federal standards; conduct routine inspections and monitoring, and report accurately the results of that monitoring.

55.     On information and belief, Plaintiff alleges that Defendant has failed to develop and/or implement sufficient BMPs at the Facility to limit pollution in industrial storm water to a level commensurate with the federal BAT and BCT standards as follows:

- The Facility does not prevent storm water flows from coming into

contact with the sources of contaminants.

- On information and belief, Plaintiff alleges that the Facility lacks sufficiently well-maintained structural controls and practices to minimize exposure of pollutants to storm water, to retain all storm water on site; or to prevent contaminants from entering into storm water. On information and belief, Plaintiff alleges that Defendant does not sufficiently treat contaminated storm water prior to discharge from the Facility.

56. On information and belief, Plaintiff alleges that since at least August 21, 2018, U.S. Metal Trading has failed to develop and/or implement an adequate SWPPP at the Facility in accordance with the requirements of Part XI.N.3 of the MSGP.

57. The SWPPP for the Facility does not include, and U.S. Metal Trading has not implemented, the required minimum and industry specific BMPs necessary to reduce pollutant levels in discharges to BAT and BCT levels. This is evidenced by sources of storm water contamination at the Facility, contaminant tracking around and off the Facility, and the Facility's discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT. U.S. Metal Trading's failure to prepare and/or implement an adequate SWPPP in all the above respects constitute violations of the MSGP. As a result, the discharges of storm water associated with industrial activity from the Facility are not in accordance with the effluent limitations contained in U.S. Metal Trading's NPDES permits, and therefore U.S. Metal Trading is violating Sections 301 and 402 of the Clean Water Act at the Facility.

58. On information and belief, Plaintiff alleges that since at least August 21 , 2018, U.S. Metal Trading has failed to conduct the MSGP's required comprehensive site compliance evaluations at least once per year and to

accordingly revise the Facility's SWPPP. MSGP § XI.N.3(a)(4).

59.     On information and belief, Plaintiff alleges that since at least August 21, 2018, U.S. Metal Trading has failed to develop and/or implement an adequate monitoring and reporting program at the Facility in accordance with the requirements of Part XI.N.5 of the MSGP. Plaintiff alleges that U.S. Metal Trading has taken storm water samples at the Facility on dates that were subsequent to large storm events, in violation of the sampling requirements of the MSGP. It artificially improves the quality of the sampling results – i.e., samples contain lower, unrepresentative levels of pollution – because they were collected after the prior storm event flushed pollutants away from the facility. On information and belief, Plaintiff alleges that U.S. Metal Trading also reported that no discharges occurred from the Facility despite evidence of numerous potential sampling events during a given reporting period.

60.     Since at least 2015, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility. The sample results were reported in the Facility's Discharge Monitoring Reports ("DMRs") submitted to the DEP. Defendant certified the accuracy of each of those DMRs.

61.     In DMRs submitted to the DEP, the Facility has consistently reported high pollutant levels from its storm water sampling results.

62.     The levels of COD in storm water discharges from the Facility have exceeded the cut-off concentration for COD of 120 mg/L established by the DEP. For example, on September 20, 2018, the level of COD measured at the Facility's only reported storm water outfall was 471 mg/L, which is almost four times the cut-off concentration. Defendant also has measured levels of COD in excess of 120 mg/L in storm water discharged from the Facility on June 26, 2018.

63.     The levels of aluminum in storm water discharges from the Facility have exceeded the cut-off concentration for aluminum of 0.75 mg/L established

17

by the DEP. For example, on September 20, 2018, the level of aluminum measured at the Facility's only reported storm water outfall was 13.7 mg/L, which is over 18 times the cut-off concentration. Defendant also has measured levels of aluminum in excess of 0.75 mg/L in storm water discharged from the Facility on February 12, 2018.

64.     The levels of copper in storm water discharges from the Facility have exceeded the cut-off concentration for copper of 0.0636 mg/L established by the DEP. For example, on September 20, 2018, the level of copper measured at the Facility's only reported storm water outfall was 1.9 mg/L, which is almost 30 times the cut-off concentration. Defendant also has measured levels of copper in excess of 0.0636 mg/L in storm water discharged from the Facility on July 6, 2020; December 3, 2018; June 26, 2018; and February 12, 2018.

65.     The levels of iron in storm water discharges from the Facility have exceeded the cut-off concentration for iron of 1.0 mg/L established by the DEP. For example, on September 20, 2018, the level of iron measured at the Facility's only reported storm water outfall was 12.9 mg/L, which is almost 13 times the cut-off concentration. Defendant also has measured levels of iron in excess of 1.0 mg/L in storm water discharged from the Facility on July 6, 2020; and February 12, 2018.

66.     The levels of lead in storm water discharges from the Facility have exceeded the cut-off concentration for lead of 0.0816 mg/L established by the DEP. For example, on September 20, 2018, the level of lead measured at the Facility's only reported storm water outfall was 0.579 mg/L, which is over seven times the cut-off concentration. Defendant also has measured levels of lead in excess of 0.0816 mg/L in storm water discharged from the Facility on July 6, 2020.

67.     The levels of zinc in storm water discharges from the Facility have

exceeded the cut-off concentration for zinc of 0.117 mg/L established by the DEP. For example, on September 20, 2018, the level of zinc measured at the Facility's only reported storm water outfall was 2.78 mg/L, which is almost 24 times the cut-off concentration. Defendant also has measured levels of zinc in excess of 0.117 mg/L in storm water discharged from the Facility on July 6, 2020; December 3, 2018; June 26, 2018; and February 12, 2018.

68.     The levels of TSS in storm water discharges from the Facility have exceeded the cut-off concentration for TSS of 100 mg/L established by the DEP. For example, on July 6, 2020, the level of TSS measured at the Facility's only reported storm water outfall was 242 mg/L, which is almost 2.5 times the cut-off concentration. Defendant also has measured levels of TSS in excess of 100 mg/L in storm water discharged from the Facility on September 20, 2018.

69.     On information and belief, Plaintiff alleges that storm water samples taken by U.S. Metal Trading at the Facility have failed to comply with the requirements of MSGP Part XI.N.5.a(2). U.S. Metal Trading failed to take and analyze any samples from required storm events at the Facility that occurred at least 72 hours from the previously measurable storm event with respect to the storm water samples taken by U.S. Metal Trading on July 6, 2020. Plaintiff alleges that storm events greater than 0.1″ occurred at the Facility on July 4, 2020; and July 5, 2020. The sample taken on July 6, 2020, was thus not from a storm event that was greater that 0.1″ in magnitude and occurred at least 72 hours from the previously measurable storm event.

70.     On information and belief, Plaintiff alleges that U.S. Metal Trading failed to take and monitor any required storm water samples at the Facility during the following periods: fourth quarter of 2020, and second quarter of 2020.

71.     On information and belief, Plaintiff alleges that U.S. Metal Trading failed to accurately report the duration between the storm event it sampled at the

Facility and the end of the previous measurable (greater than 0.1″ rainfall) storm event, as required by MSGP Part XI.N.5.a, for samples taken on the following dates: September 20, 2018, December 3, 2018, and July 6, 2020.

72.     On information and belief, Plaintiff alleges that alleges that since at least August 21, 2018, Defendant has failed to complete the MSGP's required quarterly visual monitoring of storm water discharges.

73.     On information and belief, Plaintiff alleges that Defendant has failed to monitor storm water discharges from a second driveway from the Facility located along the east side of the property along McDuff Avenue.

74.     Defendant failed to respond to a January 3, 2022 Compliance Assistance Offer finding that such compliance evaluations, a SWPPP, and quarterly visual examinations were unable to be located during a facility inspection. On information and belief, Plaintiff alleges that Defendant has failed to conduct annual comprehensive site compliance evaluations, include those evaluations in the Facility's SWPPP, and accordingly revise the Facility's storm water pollution prevention measures and controls.

75.     On information and belief, Plaintiff alleges that since at least August 21, 2018, Defendant has failed to implement BAT and BCT at the Facility for its discharges of COD, aluminum, copper, iron, lead, zinc, TSS, and potentially other pollutants. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

76.     As a result of U.S. Metal Trading's practices at the Facility, storm water containing excessive pollutants is being discharged from the Facility during rain events into the Receiving Waters.

77.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the MSGP for discharges from the Facility due to the continued discharge of contaminated storm water. Plaintiff is informed

and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and
Best Conventional Treatment Technologies
(Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

78.    Plaintiff incorporates and re-alleges paragraphs 1-68 and 74-77 as if fully set forth herein.

79.    The MSGP's SWPPP requirements oblige Sector N dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants. Defendant has failed to implement BAT and BCT at the Facility for its discharges of COD, aluminum, copper, iron, lead, zinc, TSS, and potentially other un-monitored pollutants in violation of Part XI.N of the MSGP.

80.    Each day since alleges that since at least August 21, 2018, that Defendant has failed to develop and implement BAT and BCT in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

81.    Defendant has been in violation of the BAT/BCT requirements every day since alleges that since at least August 21, 2018. Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the Facility.

### SECOND CAUSE OF ACTION
**Failure to Prepare, Implement, Review, and Update
Adequate Storm Water Pollution Prevention Plan
(Violations of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

82.     Plaintiff incorporates and re-alleges paragraphs 1-68, 73-77, and 79 as if fully set forth herein.

83.     The MSGP requires Sector N dischargers to develop, implement, and revise adequate SWPPPs.

84.     Defendant has failed to develop and implement an adequate SWPPP for the Facility. Defendant's ongoing failure to develop and implement an adequate SWPPP is evidenced by, *inter alia*, sources of storm water contamination at the Facility, contaminant tracking around and off the Facility, and the Facility's discharges of storm water contaminated above pollutant levels without the requisite application of BAT/BCT.

85.     Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the facilities' storm water monitoring.

86.     Each day since every day since August 21, 2018, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

87.     Defendant has been in violation of the SWPPP requirements every day since August 21, 2018. Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

**THIRD CAUSE OF ACTION**
**Failure to Conduct Adequate**
**Comprehensive Site Compliance Evaluations**
**(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

88.     Plaintiff incorporates and re-alleges paragraphs 1-68, 73-77, 79, and 85 as if fully set forth herein.

89.     The MSGP requires Sector N dischargers to conduct comprehensive

site compliance evaluations at least once per year, including a comprehensive review of a facility and its storm water pollution control measures and subsequent revision of a facility's SWPPP.

90.     Defendant has failed to conduct adequate annual comprehensive site compliance evaluations for the Facility.

91.     Defendant's ongoing failure to conduct adequate annual comprehensive site compliance evaluations is evidenced by, *inter alia*, Defendant's sampling of past storm water discharges that have occurred at the Facility and continue to exceed cut-off concentrations as well as DEP's finding that Defendant has failed to conduct such evaluations.

92.     Each day since August 21, 2018, that Defendant has failed to conduct adequate annual comprehensive site compliance evaluations for Facility in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The failure to conduct adequate annual comprehensive site compliance evaluations is an ongoing and continuous violation of the Act.

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement**
**Adequate Monitoring and Reporting Program**
**(Violation of MSGP and the Act, 33 U.S.C. §§ 1311, 1342)**

93.     Plaintiff incorporates and re-alleges paragraphs 1-37, 40-54, 56, and 59-73 as if fully set forth herein.

94.     The MSGP requires Sector N facility operators to implement monitoring and reporting requirements that will allow facility operators to determine whether they have adequately reduced the level of pollutants in storm water runoff through the development and proper implementation of the facility's SWPPP.

95.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility.

96.     Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program is evidenced by, *inter alia*, its practice of taking storm water samples on dates subsequent to large storm events, its reporting that no discharges occurred from the Facility despite evidence of numerous potential sampling events during a given reporting period, and its failure to monitor one of the Facility's storm water outfalls.

97.     Each day since August 21, 2018, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the MSGP is a separate and distinct violation of the MSGP and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results is an ongoing and continuous violation of the Act.

## VII.    RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.   Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the MSGP;

c.   Enjoin Defendant from further violating the substantive and procedural requirements of the MSGP;

d.   Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendant to comply with the MSGP's monitoring and reporting requirements, including ordering supplemental monitoring to

compensate for past monitoring violations;

       f.   Order Defendant to prepare a SWPPP for the Facility consistent with the MSGP's requirements and implement procedures to regularly review and update the SWPPPs;

       g.   Order Defendant to provide Plaintiff with reports documenting the quality and quantity of its discharges to waters of the United States and its efforts to comply with the Act and the Court's orders;

       h.   Order Defendant to pay civil penalties of up to $64,618 per day per violation pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

       i.   Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by its activities;

       j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

       k.   Award any such other and further relief as this Court may deem appropriate.

Dated: October 20, 2023       Respectfully submitted,

       By:    */s/ John November*      
       John November
       Florida Bar #88760
       The Public Trust Environmental Legal Institute of Florida, Inc.
       2029 North Third Street
       Jacksonville Beach, FL 32250
       Telephone: (904) 247-1972 Facsimile: 904-247-5433
       Email: john@publictrustlaw.org
       *Attorney for Plaintiff* ST. JOHNS RIVERKEEPER